UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) CR. NO. 04-10046-RGS |
| ANGEL GONZALEZ, | ) |
| AKA "KING A-SHOT, | ) |
| | ) |

<u>SENTENCING MEMORANDUM OF THE UNITED STATES</u>

On January 12, 2005, the defendant, Angel Gonzalez, a/k/a "King A-Shot", pled guilty to one count of conspiracy to distribute more than five grams of cocaine base, also known as "crack cocaine", in violation of 21 U.S.C. § 846 (Count One), one two substantive count of distributing cocaine, in violation of 21 U.S.C. § 841(a)(1) (Count Two), and one substantive count of distributing more than five grams of cocaine base, also known as "crack cocaine", in violation of 21 U.S.C. § 841(a)(1) (Count Three).  Sentencing is scheduled for July 21, 2005.  This memorandum is submitted to assist the Court in sentencing the defendant.

The Presentence Report prepared by the U.S. Probation Office, dated July 7, 2005 (the "PSR"), properly concluded that the defendant's Guideline Sentencing Range ("GSR") is 70-87 months (with a 5-year mandatory minimum), based on a Total Offense Level of 23 and a Criminal History Category ("CHC") of IV.  PSR ¶¶ 109-110.  The government requests that the Court sentence the defendant to a term of imprisonment of 70 months, representing the low end of the GSR.

On April 21, 2005, this Court sentenced Angel Gonzalez's co-defendant, Jose Gonzales, to a term of imprisonment of 63 months, representing the low end of his GSR (which was 63-78 months). The government requests that the Court likewise sentence Angel Gonzalez at the low end of the GSR calculated by probation.  The reason that Angel Gonzalez's GSR is higher than Jose Gonzalez's GSR is because of Angel Gonzalez's criminal history.  Angel Gonzalez's CHC is IV and Jose Gonzalez's was II.[1]

In 2000, Angel Gonzalez was convicted in Essex Superior Court of thee counts of armed robbery in connection with an attempted bank robbery.  On January 11, 2001, he was sentenced to 2½-4 years at MCI Concord.  On January 27, 2003, he was paroled. On October 27, 2003, his parole was revoked and a warrant for his arrest is outstanding.

I.   BACKGROUND OF THE INVESTIGATION

In 2002, the Federal Bureau of Investigation ("the FBI") commenced an investigation into drug trafficking and other suspected criminal behavior in the Lawrence and Lowell, Massachusetts area by members and associates of the Almighty Latin King Nation ("Latin Kings").  Over the course of the

---

[1] Jose Gonzalez's Adjusted Offense Level ("AOL") was 25 while Angel Gonzalez's AOL is 23 because probation held Jose Gonzalez responsible for 29.5 grams of crack cocaine but held Angel Gonzalez responsible only for the one sale that he was directly involved in – i.e., the distribution of 12.1 grams of crack cocaine on September 16, 2003 (Count Three)

investigation, cooperating witnesses ("CW's") working for the FBI made approximately 30 purchases of heroin, cocaine and cocaine base from members and associates of the Latin Kings.

All of the drug purchases were made in the Lawrence/Lowell. All of the purchases (and most of the conversations and negotiations leading up to the purchases) were consensually recorded.  Most of the deals also took place in a car equipped with audio and video equipment.  The CW's also wore transmitters during most of the purchases.  The transmitters enabled law enforcement agents to listen to conversations as they took place.

The investigation also disclosed substantial amounts of information regarding the organization and structure of the Latin Kings.  The Massachusetts Chapter of the Latin Kings is a street gang with hundreds of members in Lawrence, Lowell and other cities.  The Latin Kings operate local chapters throughout the state including chapters inside many correctional facilities. Many members of the gang are involved in a broad range of illegal activities including drug trafficking and crimes of violence undertaken in furtherance of protecting the interests of the gang and its members.  More information regarding the Latin Kings is set forth in the detention affidavit which was filed in this case on February 24, 2004.  See DKT. #15.

The present indictment resulted from one aspect of this investigation:  the distribution of crack cocaine and cocaine by

Angel Gonzalez, a/k/a "King A-Shot", and Jose Gonzalez, a/k/a "King Strike", a/k/a "Tito". The sales were surveilled by law enforcement agents and recorded on audio and/or video tape.

II. THE TRANSACTIONS INCLUDED IN THE INDICTMENT

    A. Count 2: the 9/12/03 sale of 14.4 grams of cocaine by Angel Gonzalez[2]

On September 12, 2003, a cooperating witness working with the FBI (the "CW"), met with agents and called Angel Gonzalez and they had a consensually recorded call in which the CW said that he/she was selling cocaine and Angel Gonzalez said he also sold cocaine and could get a good price for the CW from his cocaine connection. Angel Gonzalez told the CW he could get him/her 14 grams of cocaine for $500 and told the CW to pick him up at 78 Inman Street in Lawrence. A few minutes later, Angel Gonzalez called back and said that his connect did not want to meet anyone. The CW said he/she would give Angel Gonzalez the money and let King A-Shot conduct the transaction himself.

That afternoon, agents provided the CW with a body recorder and transmitter, $500 in official government currency ("OGC"), and a car equipped with audio/video surveillance equipment, and told the CW to meet Angel Gonzalez. Under surveillance, the CW drove to 78 Inman Street in Lawrence where he/she picked up Angel Gonzalez. Agents then followed the CW and King A-Shot to 28A

---

[2] Jose Gonzalez is not charged in Count Two of the Indictment.

4

Railroad Street in Methuen. The CW gave Angel Gonzalez the $500 in OGC and King A-Shot went into the rear building at 28 A Railroad Street. Angel Gonzalez returned to the car moments later and handed the CW a plastic bag containing the cocaine. They then drove back to 78 Inman Street where the CW dropped off Angel Gonzalez. DEA NERL certified that the substance Angel Gonzalez sold the CW was 14.4 grams of cocaine.

The car ride to and from Methuen was video and audio taped from the inside of the car. During the ride to pick up the cocaine, Angel Gonzalez can be seen and heard telling the CW that he can get him/her "anything you need" (referring to drugs). In addition, Angel Gonzalez can be seen and heard telling the CW a story about a man who had been telling people that Angel Gonzalez ripped him off for $200. Referring to this individual, Angel Gonzalez stated: "I got my burner" (i.e., his gun) and went over to his house "and I was gonna fix this shit" and I knocked on the door and someone looked out the window but no one opened the door "but I'm telling you right now anything would have come out of his mouth I would have put a hole in his mouth."

During the car ride back to Angel Gonzalez's house, after they got the cocaine, the CW asked whether the same supplier who got Angel Gonzalez the cocaine could get crack and Angel Gonzalez can be seen and heard on tape saying no but that he has another supplier from whom he can crack for the CW and stating "my other

connect can cook it, my boy can cook it."

    B.    <u>Count 3: the 9/16/03 sale of 12.1 grams of crack cocaine by Angel Gonzalez and Jose Gonzalez</u>

On September 16, 2003, agents provided the CW with a body recorder and transmitter, $600 in OGC, and a car equipped with audio/video surveillance equipment, and the CW went to meet Angel Gonzalez to buy crack cocaine. The CW went to Angel Gonzalez's residence at 78 Inman Street in Lawrence and met with Angel Gonzalez asked for 14 grams of crack cocaine.[3] Angel Gonzalez said that his crack cocaine contact was unavailable and that he was waiting for his "material" to arrive.

The CW and Angel Gonzalez's got into the CW's car and Angel Gonzalez's stated that they could get crack from "Tito" (a/k/a King Strike, a/k/a Jose Gonzalez). The CW and Angel Gonzalez drove to 286/288 Farnham Street in Lawrence, Jose Gonzalez's apartment. Angel Gonzalez went into the building and came back a short time later and said that Strike (i.e., Jose Gonzalez) was going to get the cocaine and "chef" it (i.e., cook the cocaine into crack), but that it would probably cost $600 not $500, and that Jose Gonzalez would "chef" it for $40. Angel Gonzalez and the CW then left and got some beer.

---

[3] 78 Inman Street is listed as **ANGEL GONZALEZ'S** address on his criminal history record. Electricity records for 78 Inman Street indicated that the subscriber has been **DESI GONZALEZ** since 9/15/03. **DESI GONZALEZ** is the brother of **ANGEL GONZALEZ** and, according to prison records, was a regular visitor to **ANGEL GONZALEZ'S** in prison.

A short time later, the CW and Angel Gonzalez returned to 286/288 Farnham Street and, when they arrived, the CW can be seen on the video handing Angel Gonzalez the OGC. Angel Gonzalez went into the building and returned a few minutes later with Jose Gonzalez and they both got in the car (Angel Gonzalez in the front and Jose Gonzalez in the back). Angel Gonzalez can be heard on the audio tape telling the CW that Jose Gonzalez is "gonna get fuckin' a fourteen of powder and he's gonna chef it for you . . ." Angel Gonzalez told the CW to drive to Cross Street. On the way, Angel Gonzalez handed the OGC to Jose Gonzalez.

During the drive, Jose Gonzalez and the CW can be seen and heard talking about Jose Gonzalez's crack cocaine trafficking. Jose Gonzalez explained to the CW the benefits of buying cocaine in powder form and then cooking it (as opposed to simply buying the crack), and encouraged the CW to "always" buy drugs from him as he will give him/her the best price and lead to better profits for the CW. Jose Gonzalez can then be seen and heard telling the CW that he was cooking "200 grams" of crack cocaine a week and that he "hustled" a number of different drugs as a middle man. When they got to Cross Street, Jose Gonzalez made a call on his cell phone and then told the CW to drive to Auburn Street.

When they got to Auburn Street (under continued surveillance), Jose Gonzalez got out of the car and met with an

unidentified male, whom Jose Gonzalez introduced as "TONY". TONY got into the car and Jose Gonzalez gave TONY the $600 in OGC that the CW had given to Angel Gonzalez. The CW was directed to a house on Center Street in Methuen. TONY went into the house. While they waited, the CW, Jose Gonzalez, and Angel Gonzalez continued to talk about the quality and cost of the drugs the CW was buying. TONY came out moments later, and got into the car and handed Jose Gonzalez a clear plastic bag containing cocaine. Jose Gonzalez then handed the bag along with $80 in change to CW. The CW then held up the bag of cocaine and "inspected" it, including smelling it. The CW stated: "that don't smell like the last one . . . I like the way the last one smelled." Jose Gonzalez then stated that they would have to go to his house to cook the cocaine.

While driving back to Jose Gonzalez's apartment, the CW stopped so that Jose Gonzalez could buy some ice he needed to cook the powder cocaine into crack. The three of them went back to Jose Gonzalez's apartment, and, when they arrived, Jose Gonzalez can be heard on tape introducing the CW to his wife and children. Jose Gonzalez cooked the powder cocaine into crack and provided the crack to the CW in a clear plastic bag. Jose Gonzalez can be heard on tape telling the CW: "You can take it wet like this right. But once you get to the wherever your going to go let it out to dry with the air okay?" "Just let it dry by

8

itself with the air, you know what I mean or you can sit there with the fan you know what I mean?" During the cooking, Angel Gonzalez could be heard telling the CW: "He's just drying it up and breaking it down." The CW gave Jose Gonzalez $40.00 for cooking the crack and then left the apartment. DEA NERL certified, and agents would testify, that the substance was 12.1 grams of crack cocaine.

## CONCLUSION

For the foregoing reasons, the government requests that the Court sentence the defendant to a term of imprisonment of 70 months, representing the low end of the Guideline Sentencing Range.

                                          Respectfully submitted,

                                          MICHAEL J. SULLIVAN
                                          United States Attorney,

By:  /s PETER K. LEVITT
     PETER K. LEVITT
     Assistant U.S. Attorney
     One Courthouse Way
     Boston, MA 02210
     (617)748-3355

July 18, 2005